UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

ANGEL HOUSTON,                          )
                                        )
                    Plaintiff,          )
                                        )
          vs.                           )   Case No. 1:12-cv-00328-WTL-DML
                                        )
HYATT REGENCY INDIANAPOLIS,             )
HYATT CORPORATION, and                  )
C.G. SECURITY SERVICES, INC.,           )
                                        )
                    Defendants.         )

# Report and Recommendation Regarding Sanctions Against
## Defendant C.G. Security Services, Inc.

This matter is before the court on three motions by plaintiff Angel Houston seeking sanctions against defendant C.G. Security Services, Inc. ("CG") because of discovery misconduct. The motions, at Dkts. 169, 197, and 206, are now fully briefed. As set forth in greater detail below, the evidence is convincing that CG engaged in a pattern of obstreperous discovery behavior including (a) testifying falsely about its documents and discovery efforts, (b) failing timely to correct false representations regarding its discovery, (c) falsifying documents, and (d) impeding the fair conduct of depositions. The magistrate judge recommends that Judge Lawrence impose the following sanction:

> Monetary sanctions against CG and in favor of plaintiff Houston requiring CG to pay Houston reasonable attorneys' fees for the work of her counsel in the conduct of discovery since CG became a party to this litigation, including fees incurred in presenting her motions for sanctions.

# I.  <u>Background</u>

Plaintiff Angel Houston initiated this litigation on March 14, 2012, charging the Hyatt Corporation and the Hyatt Regency Indianapolis (the "Hyatt Defendants" or "Hyatt") with breach of contract, intentional misconduct, and negligence in connection with injuries Ms. Houston sustained from a fall at the downtown Indianapolis Hyatt hotel during a hotel-sponsored New Year's Eve party ("Party") on December 31, 2010/January 1, 2011.  In general, Ms. Houston claimed that the Hyatt Defendants failed to provide a safe and secure environment for the Party and that that failure was the proximate cause of her injuries and consequential damages stemming from those injuries.  As the court understands it, Ms. Houston has evaluated her damages as exceeding one million dollars.  (*See* Dkt. 159 at p. 2)

In August 2012, the Hyatt Defendants were permitted to amend their answer to name CG as a non-party whose acts or omissions may have caused or contributed to Ms. Houston's injuries and damages.  Hyatt had contracted with CG to provide security personnel for the hotel environs during the Party.  As was eventually learned in discovery, CG has provided security services for the Hyatt for years.  Indeed, the Hyatt has been CG's only client for several years.  The Hyatt's naming of CG as a non-party tortfeasor led Ms. Houston to serve a non-party documents subpoena on CG and then, later, to amend her complaint to add CG as a defendant, alleging it failed to provide adequate security services and that that failure proximately caused her injuries and damages.

Before the court outlines the discovery issues raised by Ms. Houston as the bases of her sanctions motions, it acknowledges that Judge Lawrence recently granted summary judgment in favor of Hyatt, finding (among other things) that even if Hyatt breached any duties to police the premises adequately, control the crowd, monitor partygoers' alcohol intake, or use more security personnel than it did, a reasonable juror could not find that Ms. Houston's injuries were proximately caused by these breaches of duty. (*See* Dkt. 213.) Judge Lawrence also stated that, in the absence of Ms. Houston's sanctions motions, summary judgment likely would be appropriate as to CG as well. Because Ms. Houston's sanctions motions seek an entry of default against CG, an adverse evidentiary inference, or other sanctions that the court deems just, Judge Lawrence has not entered judgment in CG's favor.

The fact that CG has a meritorious defense to Ms. Houston's claims does not excuse discovery misconduct, of course. It indeed starkly demonstrates how particularly unwise it is to obstruct the discovery process. It would, however, make sanctions of default or an adverse evidentiary inference particularly harsh. But before we discuss the justness of any sanction, we first describe CG's discovery misconduct.

## II.   <u>CG's Discovery Conduct</u>

CG's course of conduct during discovery reflects a severe lack of effort to meet its obligations to provide timely and truthful information. The court is convinced that in addition to CG having provided knowingly false information in discovery, CG made misleading statements about its discovery efforts along the way.

Most of CG's obstructionist discovery conduct is related to Ms. Houston's efforts to determine what persons worked for CG in security capacities on New Year's Eve. She wanted to know who worked, where they worked, the hours they worked, information related to their qualifications as security personnel, and information on how to contact them. For example, Houston's first interrogatories and document requests sought, among other things, the identity of the guards who worked during the Party and time or payroll records reflecting their work and the hours they worked. This information was relevant to Ms. Houston's liability theories.

The court will describe in some detail the tangled web of information CG provided to Ms. Houston about its guards. CG claims that it did the best it could to provide Ms. Houston with accurate information and that the information changed over time as CG located more documents or the memories of its principals improved. Those excuses are not sufficient here to allay the substantial burden CG's ever-changing answers about its guards imposed on Ms. Houston. CG did not at the outset alert Ms. Houston (or Hyatt) that it could not provide reasonably definitive information about its guards. And CG's apparent inability timely to locate documents was a problem of its own making. Before CG was added as a party in December 2012, Ms. Houston served on CG a non-party documents subpoena, but CG never responded to that subpoena. Although Ms. Houston never sought relief for CG's failure to comply with the subpoena, the service of that subpoena alerted CG to the need to search for and secure its documents related to the security work it

provided Hyatt for the Party. CG knew that it stored certain business documents in an off-premises storage unit and, even accepting CG's dubious testimony about the efforts to search the storage unit, the first search did not occur until at least April 2013.

## A.     Discovery Concerning CG Guards

### 1.  CG's responses to Houston's first discovery requests and the March 2013 deposition testimony of its principals

CG responded to Houston's first interrogatories and document requests on March 27, 2013. Its discovery responses included a document (at Dkt. 169-5 and 169-9) showing that 17 unnamed guards worked the New Year's Party and a separate two-page document (at Dkt. 180-4, pp. 9-10) listing the names of CG security guards for the New Year's Party and their posts within the hotel.

The same day that CG delivered its initial discovery responses to Ms. Houston, it produced two Rule 30(b)(6) witnesses for deposition in accordance with a notice of deposition served by Hyatt. CG's witnesses were Charles Guynn, CG's owner and president, and Jennifer Mosley, CG's general manager. Mr. Guynn testified that the document listing 17 guards (which was marked as Guynn Exhibit 4) is a schedule and invoice from CG to the Hyatt for the Party. (Guynn Tr., 169-8, p. 52:5-16). He testified that it reflects the number of guards who worked on New Year's Eve (i*d.* p. 55:8-12) and the hours they worked. (*Id.* p. 72:14 to 73:14). Hyatt's counsel asked Mr. Guynn whether it was true that by counting the number of guards shown on page 2 of Exhibit 4, one "would know the number of C.G. guards present at the New Year's Eve party in question." He answered, "That's correct."

*Id.*  That testimony was later shown to be untrue.  On December 18, 2013, Mr. Guynn testified that this document was a worksheet used by him to plan the number of guards to schedule for work on New Year's but did not reflect how many guards actually worked.  (December Guynn Dep., Dkt. 207-2, p. 92:18 to 94:5).

During his March 27 deposition, Mr. Guynn also testified about a second document pertaining to the scheduling of CG security personnel for the Party, which was identified as Guynn Exhibit 5.  (*See* Dkt. 169-10).  He testified that the first two pages of this document identify the names of the security officers who were assigned to various places within the hotel and the hours they were scheduled to work.  (March Guynn Dep., Dkt. 169-8, p. 84:7-23).  He confirmed in response to a question by Hyatt's counsel that Deposition Exhibit 5 "accurately reflect[s] the names of the officers that were present and generally their detailed assignment." (*Id.* p. 85:10-14).  That testimony was also later shown to be untrue.  On December 18, 2013, Mr. Guynn testified that Guynn Exhibit 5 was a planning document that he created as part of CG's initial efforts to determine guards who might be available to work on New Year's Eve and the document did not reflect an actual detail of workers on New Year's Eve.  (December Guynn Dep., Dkt. 207-2, p. 89:13 to p. 92:3).[1]

---

[1]    CG attempts to justify the testimony on March 27 on the grounds that CG had not had sufficient opportunity to look for documents and "human memory is not always accurate."  The court does not accept these excuses.  Mr. Guynn never suggested during his March 27 deposition that he was unsure of his testimony or was unprepared to answer questions as CG's Rule 30(b)(6) witness without gathering additional documents.  Moreover, Mr. Guynn admitted in deposition testimony that throughout this case, he never spoke to any guard whom he believed

Mr. Guynn's testimony on March 27, 2013, as well as the Rule 30(b)(6) testimony by Ms. Mosely on that date, revealed that CG had not at that point conducted a thorough search for documents. Mr. Guynn testified that as of his March 27, 2013 deposition, he had not been asked to look for any and all documents that might be related to Ms. Houston's injury during the New Year's Eve Party, although CG's lawyer volunteered that the two had met to review Ms. Houston's document requests. (March Guynn Dep., Dkt. 169-8., p. 147:16-23). Mr. Guynn testified that Ms. Mosley would know whether certain documents pertaining to CG's work on New Year's Eve, such as security observation logs, were still in CG's possession because Ms. Mosley maintains those records. (*Id.* p. 149:18 to 150:5).

Ms. Mosely testified about another document central to the events on New Year's, but she had not looked for it because no one had asked her to. Ms. Mosley had taken the lead in investigating Ms. Houston's fall and injury on New Year's Eve. She took notes that evening, later spoke to at least two CG guards, and prepared an incident report that CG gave to Hyatt.[2] Ms. Mosley testified that on New Year's Eve, she had a notebook in which she recorded the notes of her investigation and that she carries a notebook with her on a regular basis during her security work for CG. (*Id.,* p. 212:14 to 213:15). Ms. Mosley saves her notebooks

worked on New Year's, other than Ms. Mosely, in an effort to gather requested information or check the accuracy of his memory. In addition, by March 27, he had had ample opportunity to confirm this information, which Ms. Houston had requested repeatedly since December.

[2]     Two versions of this incident report ultimately were produced. They differ slightly with respect to events on January 3, 2011, but otherwise appear identical to each other. *See* Dkts. 148-5 and 148-6.

(*id.*, p. 215:8-16) but had not looked for them because no one had asked her to and she did not know where her notes from New Year's Eve might be. (*Id.* p. 214:10-17). As it turns out, Ms. Mosley's notes were never produced; CG claimed it could never find them.

### 2. The sign-in sheet produced April 24, 2013

On April 24, 2013, CG's counsel sent a letter to Ms. Houston's counsel supplementing CG's document production and stating that Mr. Guynn and Ms. Mosley had not found the security observation logs or Ms. Mosley's notes "[a]fter a reasonable investigation," but had two new documents to produce. (Dkt. 169-13). They were (a) a version of Guynn Deposition Exhibit 4 (the document indicating that 17 guards worked on New Year's Eve) that was dated December 20, 2010, and signed by representatives of Hyatt and CG; and (b) a document purporting to be a "Sign In & Out Sheet" for the CG guards who worked the New Year's Eve Party. This latter document—Dkt. 169-13 at p. 2—listed names and telephone numbers for 18 persons.

About two weeks later, on May 10, 2013, Ms. Houston took a deposition of Mr. Guynn. Regarding the Sign-In Sheet, Mr. Guynn testified that the document was created either the night of or in the days preceding the New Year's Party and it "was taken off the jump stick." (May 10, 2013 Guynn Deposition, Dkt. 169-14, p. 124:8-21). CG now suggests that Mr. Guynn did not mean that the document existed on New Year's Eve, but that is the clear import of his testimony, which reads as follows:

> Q.     When was this document created?

> A.     The night of – or the preceding days before it was needed.  It was taken off the jump stick so that you can have a hard copy of it. We don't usually have a hard copy of these reports.

Later, it was learned that the Sign-In Sheet produced on April 24, 2013, did not in fact exist in 2010 but was created by Mr. Guynn and Ms. Mosley in the course of this litigation.  The clear meaning of Mr. Guynn's testimony on May 10 and reinforced by CG's counsel's earlier cover letter dated April 24, 2013, was that the document was a business record existing as of New Year's Eve.  Mr. Guynn's failure to testify in response to the question "When was this document created," that he and Ms. Mosley had only recently created the Sign-In Sheet based on their memories of the guards who had worked at the Party was deliberately misleading.

Six weeks after Mr. Guynn testified about the Sign-In Sheet, Ms. Mosley was deposed, on June 24, 2013.  During her deposition, on questioning from Ms. Houston, Ms. Mosley also provided testimony indicating that this Sign-In Sheet was used by CG at the New Year's Party.  She was asked about its creation, and she answered that she created it "[p]rior to the event."  (June 24, 2013 Mosley Dep. Trans., Dkt. 185-2, at p. 167:1-5).  She said she had not seen the document for "a while," and the last time she saw it was "[p]robably the event."  (*Id.* p. 167:22 to 168:1).  That testimony was also misdirection, though this time CG's counsel brought out on his cross-examination of Ms. Mosley that she **and** Mr. Guynn—after the litigation—had created the Sign-in Sheet based on their collective memories as to whom they thought had worked at the Party.  (June 24, 2013 Mosley Dep. Trans.,

Dkt. 185-2 at p. 190:11-23). CG's counsel's correction of Ms. Mosley's testimony was absolutely necessary, though Ms. Mosley did not explain why she had not initially told Ms. Houston the truth. There is no justification for Mr. Guynn's deliberate failure to answer truthfully in his deposition about the creation of the Sign-In Sheet. Nor is there any explanation why Ms. Houston was not informed when the Sign-In Sheet was produced that the document was not a business document contemporaneous with the Party.

### 3. CG provides a *new* list of guards on June 3, 2013

On June 3, 2013, CG sent a new list of guards to Houston and told Ms. Houston to substitute that list for the information supplied on March 27, 2013, in CG's interrogatory answers. This June list has the names of 20 people who purportedly worked at the Party. (Dkt. 136-12). CG's letter to Houston did not explain the bases for the information contained on this list.[3]

### 4. Later in June, CG states that its payroll records will provide definitive information about the guards who worked on New Year's Eve

Less than two weeks later, on June 14, 2013, CG produced yet a different list of guards and told Houston that it had requested copies of checks from its banking institution "to determine who actually worked the event to resolve any ambiguities

---

[3]     At Ms. Mosley's deposition on June 24, 2013, she testified that she had created this June 3 list using "the schedule," a document that, as she described it, did not match any of the documents that CG had previously provided to Ms. Houston. (Dkt. 180-3, at p.139:8-23 and p. 140:7 to 141:13). At Mr. Guynn's deposition in December 2013, CG's counsel stated that he had created the June 3 list using information supplied from CG. (12/28/13 Dep. at pp. 97-99).

between the documents it earlier had produced" regarding this issue.[4] Those earlier documents were (a) the Sign-In Sheet about which Mr. Guynn had testified and which contained 18 names, (b) the Guynn Deposition Exhibit 4 list of 17 unnamed guards (*see* Dkt. 169-21); (c) the Guynn Deposition Exhibit 5 "work detail" identifying numerous individuals as having worked the Party but did not match the Sign-In Sheet or the June 3 document; and (d) a new document (at Dkt. 169-23, p. 5) that had "come to CG's attention" while looking for other documents. CG characterized the new document as the "final schedule" of the Exhibit 5 work detail and stated that Exhibit 5 was actually a "preliminary schedule of people who might work the event." CG's June 14, 2013 letter did not acknowledge that Mr. Guynn earlier had given sworn testimony that Exhibit 5 was an accurate reflection of the persons who had actually worked at the Party and the places to which they were assigned.

Instead, the letter promised that payroll checks that were being requested from CG's banking institution would "resolve ambiguities" among the documents CG had produced about who actually worked the event. Later it was learned that the representation that payroll checks would provide definitive information about who worked was not true because Mr. Guynn had paid several of the guards in cash.

---

[4]   On June 5, 2013, the court resolved certain discovery issues between Houston and CG and ordered that Ms. Houston is entitled to determine which CG employees actually worked and when on New Year's Eve and how much they were paid. (Dkt. 115 at p. 2). The court ordered CG to provide this information by June 14. The court also ordered CG to provide information to Houston that would permit her to determine the percentage and amount of income that CG derives from doing business with Hyatt. (*Id.* at p. 3)

When CG obtained the payroll checks, it found payroll checks for persons that were not on its June 3 list and no payroll checks for some persons who were on the June 3 list. CG's counsel advised Ms. Houston on July 10 that Mr. Guynn must have paid these guards with cash and not a payroll check, and provided yet another list containing 25 names of guards who worked the Party. (Dkt. 198-1).

5. **By June 24, 2013, CG still had not conducted a thorough search for documents**

Ms. Mosley was deposed a second time on June 24, 2013, and she was asked about her efforts to locate documents. She said that in addition to CG's security offices, CG stores its business documents in a storage unit that Ms. Mosley also uses for her personal items. (June 24, 2013 Mosley Deposition Transcript, Dkt. 169-15, p. 135:8-21). She stated that she had been to her personal storage unit "multiple times" to look for her handwritten notes but nothing else:

Q. And have you been to that personal storage unit to look for any documents relevant to this case?

A. Yes, multiple times.

Q. What documents have you looked for at your storage unit?

A. My hand notes, handwritten notes.

Q. Anything else?

A. No.

(*Id.* p. 135:22 to 136:4). She confirmed, however, that CG maintains some financial records and personnel records in the storage unit. She explained that when she went to the storage unit, she looked for information "pertaining to this case" and

"moved a lot of stuff"; documents like personnel files for ex-employees could be in the storage unit "somewhere" and perhaps in a tub of documents that she did not look in. (*Id.* p. 136:18 to 137:15). When asked whether she looked for payroll information for the employees who worked on New Year's Eve, she said "no" "[b]ecause Mr. Guynn takes care of all that." (*Id.* p. 138:5-12). And she confirmed that Mr. Guynn had not been to the storage unit to look for records. She knew that because he does not have a key and would need to ask her to gain access to the unit. (*Id.* p. 138:13-19). Her testimony reads:

Q. Have you looked, you personally looked, for the payroll information for the employees that worked the event?

A. Payroll, do you mean for the event?

Q. Yes.

A. No.

Q. Okay. And why have you not looked for those?

A. Because Mr. Guynn takes care of all that.

Q. Has he been to your storage unit?

A. No.

Q. Does he have a key to your personal storage unit?

A. No.

Q. He would have to ask you to access that storage unit, correct?

A. Yes.

Ms. Mosley also said that the last time she looked for information that would identify the guards who worked New Year's Eve was the end of May 2013, but that she had found "nothing." (*Id.*, p. 139:3-7).

After taking a break to discuss privately with CG's counsel her trips to the storage unit, Ms. Mosley gave different testimony about her searches for documents in response to questions from CG's counsel. (*Id.* p. 195:5-9). She said that she went to her storage unit in May and in June to look for documents and "pulled tubs, boxes, bags, crates out in the hall to go through, [and] search for the requested documents." (*Id.* p. 187:24 to 188:9). She agreed with CG's counsel that she had "looked for anything related to New Year's Eve 2010" and had searched for two to three hours. (*Id.* p. 188:12-18). She did not, however, change her testimony about Mr. Guynn's lack of participation in any search of the records at the storage unit. But after Ms. Houston filed her first motion for sanctions against CG and attacked CG's discovery efforts, Ms. Mosley completed an errata sheet in which she said that Mr. Guynn *had* gone with her "in early April" to the storage unit, and she had forgotten about this occasion because she was nervous. (Dkt. 180-3 at p. 14).

Ms. Mosley's new recollection via an errata sheet is questionable in light of CG's counsel having made a special effort after private consultation with Ms. Mosely to elicit from her testimony about the extent of her efforts to look for documents. Her different answers to her counsel's questions and her errata changes are also inconsistent with the facts that (a) *after* Ms. Houston's sanctions motion, CG found numerous documents in Ms. Mosley's storage unit when it

searched the unit in mid-July 2013 accompanied by CG's counsel and (b) in a later deposition of Mr. Guynn, CG's counsel instructed him to not answer questions about the number of trips he made to the storage unit to look for documents before July 17, 2013. (*See* Guynn Dep. Trans., Dkt. 207-2, p. 113:14 to 116:13).

### 6. New documents found after Ms. Houston filed her sanctions motion have a different list of guards than the prior documents

Ms. Houston's sanctions motion, filed July 10, 2013, led CG to search for documents, accompanied by its counsel. CG's counsel sent documents to Ms. Houston with an email dated July 17, 2013, explaining that Ms. Mosley's storage unit was searched that day and CG had located documents from the New Year's Eve work. (Dkt. 148-3). Among these documents were payroll records, a Sign-in Sheet bearing the signatures of the guards who worked on New Year's Eve, and a separate Sign-in Sheet containing the names of the same guards with handwritten notations about the areas to which they were assigned for the Party. (*See* Dkt. 185-5 at pp. 2 and 12). The names on these Sign-in Sheets do not match any of the other documents CG had produced before and had testified were accurate lists of the guards who worked on New Year's Eve. In addition, Mr. Guynn had testified in March that the Sign-In Sheet is used by guards to record their attendance at the pre-shift informational meeting at which 100 percent participation is "almost guaranteed," because attending pre-shift is a requirement for being paid. (Dkt. 169-8, at p. 135:23 to 136:6). He said that everyone who worked at the event "would be on the sign-in sheet." *Id.* That testimony also was not true.

### 7. CG provides a new list of guards on November 1, 2013

On November 1, 2013, CG supplemented its answers to Ms. Houston's February 2013 interrogatories and supplied a new list of security guards and their work detail for the Party, representing that this list reflects the guards on duty "to the best of Defendant's knowledge." (Dkt. 197-1, supplemental answer to interrogatories 4 and 5 and Exh. I thereto). Twenty-two persons appear on this list. CG's supplemental answers did not explain how CG determined that this information was more accurate than the numerous and varying lists it had supplied before, did not disclose the sources it used to create the list, and did not attempt to explain the discrepancies between this list and the information it had earlier supplied and which Mr. Guynn had testified was accurate.

CG agreed that Mr. Guynn would testify at another deposition regarding "discovery supplementation issues." (Dkt. 197-4 at p. 1). Ms. Houston's expert on security issues was scheduled to be deposed in early November. That deposition had to be postponed so the expert could review the new information.[5]

---

[5] CG has filed a sur-reply to Ms. Houston's third sanctions motion to address that the expert's opinions were not tied to the number of guards or their location during the Party and thus the discovery problems regarding the guards could not have interfered with the expert's formulation of his opinions or Ms. Houston's securing of expert testimony to support her legal theories. That point reinforces the court's conclusion that a sanction prohibiting CG from defending itself on the merits may be unjustified. But the fact that information about the number of guards and their posts did not ultimately have the importance and weight Ms. Houston believed it should does not excuse CG's failure to look for and tell the truth about the information. Nor did it permit CG to create documents and pass them off as business records.

### 8. Mr. Guynn's December 2013 testimony does not repair the problems with discovery before that date

After much wrangling to set a new date and time for Mr. Guynn's deposition, he was deposed a third time, on December 18, 2013.[6]

The deposition did not go smoothly. Mr. Guynn's counsel stopped the deposition for breaks numerous times so that he could speak to Mr. Guynn. The transcript reveals that Mr. Guynn became quite irritated as the deposition wore on, and the court surmises that CG's lawyer was attempting to calm his client. CG's counsel did not permit Mr. Guynn to answer all the questions asked of him, determining that they were outside the scope of the deposition or immaterial to the

---

[6]     CG's behavior with respect to setting a new date for Mr. Guynn's deposition was obstreperous and reflects improper gamesmanship. Initially on November 15, CG agreed to produce Mr. Guynn for deposition on December 13, a date that it offered as Mr. Guynn's "best day" for his deposition. (Dkt. 197-13). On December 10, CG told Ms. Houston that CG was imposing a three-hour time limit on Mr. Guynn's deposition. (Dkt. 197-18). Then, on the afternoon of December 12—the day before the deposition—CG told Ms. Houston that Mr. Guynn had just informed his counsel that he had a meeting on December 13 and would be available for his deposition from 11:00 a.m. to 12:15 p.m. and would return at 2:00 p.m. (Dkt. 197-19). This schedule would force Ms. Houston to limit her questioning to three hours since the parties already had agreed to end the deposition at 4:00 p.m. to accommodate the schedule of Hyatt's lawyer. Ms. Houston objected to Mr. Guynn taking a two hour break during his deposition, but CG was firm. (Dkt. 197-20 at p. 2). Later that day, the deposition was cancelled. (Dkt. 197-20). CG faults Ms. Houston for not working around Mr. Guynn's scheduling conflict. The fault runs the other way. Mr. Guynn had agreed a month before that December 13 was the date of his deposition. Mr. Guynn's later scheduling of a meeting to take place in the middle of his deposition and waiting until the day before the deposition to tell his counsel, is behavior fairly characterized as impeding, delaying, and frustrating his fair examination. *See* Rule 30(d)(2). And given its many discovery failings that created the need for the deposition, CG's insistence on these conditions is shocking. Further, it is that very type of behavior that makes less credible CG's suggestions that its difficulties throughout the case with providing timely or accurate information to Houston about the guards on duty on New Year's Eve stemmed from mere faulty human memory.

merits of the case.  The parties' email exchanges before the deposition do not reflect a clear agreement on the precise scope of the deposition, but CG's supplements to discovery was the expected focus of the deposition.  As Ms. Houston points out, a deponent may not be instructed to refuse to answer a question except when necessary to preserve a privilege, enforce a limitation on testimony that the court has ordered, or to present a motion for a protective order.  Rule 30(c)(2).  The instructions to Mr. Guynn were improper and frustrated a fair examination of him.  Rule 30(d)(2).

### 9.  CG's overall discovery conduct related to its guards—a post script

After carefully reviewing the documents supplied over time by CG and all of Mr. Guynn's testimony, it appears to the court that by December 18, 2013, CG finally provided Ms. Houston with the most complete information it had regarding the guards who worked, when they worked, and where they worked during the New Year's event—even though the aggregate documents and testimony still leave some doubt regarding the exact guards and their posts and hours.[7]  In the meantime and since March, however, CG had purposefully provided information it either knew was incorrect or could not be confident was correct.  And Mr. Guynn purposefully did not contact the guards he believed had worked on New Year's Eve even though they could have assisted him to provide complete and accurate information and

---

[7]      As one example, CG's November 2013 list shows that guard Shaneka Cheatham was posted at the old McDonald's after midnight but at his December deposition, Mr. Guynn stated that, based on other information that CG has produced including payroll records, it appears that Ms. Cheatham was never stationed at the old McDonald's post and did not work after midnight.  (Dkt. 207-2, p. 80:7 to 83:3).

were sources he should have contacted to prepare himself as a Rule 30(b)(6) witness.

From the beginning, Mr. Guynn certified that information was accurate when he had no good basis for doing so. It is probable that at his March 2013 deposition, Mr. Guynn recognized his own planning documents as just that—preliminary data that could not be relied upon as reflecting the actual security detail on New Year's Eve. Also extremely problematic is Mr. Guynn's having participated with Ms. Mosley in creating the April Sign-in Sheet in the midst of litigation but then presenting the document as a business document created for the New Year's Party.

These are not innocent, excusable failures. They are repeated and reflect either a design to misdirect and hamper Ms. Houston's search for truth or, at best, a reckless and objectively unreasonable disregard of discovery obligations. CG's obstructionist discovery behavior regarding its security guards has prejudiced Ms. Houston. She was forced to focus immense effort to attempt to unravel CG's misinformation.

**B. Mr. Guynn's evasive or false testimony about matters other than the work detail of CG's security guards**

In addition to the problems surrounding CG's ever-changing testimony and documents regarding the work detail of its security guards, CG provided demonstrably evasive or false testimony about at least two other matters. They are an incident surrounding another hotel guest on New Year's Eve and the amount of CG's annual revenue attributable to work for the Hyatt.

### 1. Another hotel guest who needed security assistance

Ms. Houston sought discovery regarding any incidents other than her injury during the Party that required the special attention of CG's security forces. In Mr. Guynn's May 10, 2013 deposition, he provided detailed information about a guest in a room nearby to Ms. Houston's for whom a call had been made for medical assistance. He explained that security was notified that someone on the 17th floor was sick and that he and Ms. Mosley headed to the 17th floor to deal with that situation but once on the 17th floor, learned about Ms. Houston. Ms. Mosley then headed to Ms. Houston's room and Mr. Guynn went to the other guest's room. (Guynn Dep. Trans., Dkt. 203-2, p. 48:7-25). Mr. Guynn was asked whether he remembered what the problem was with the guest to whom he attended, and he testified that the female guest had had too much drink, had fallen, and needed first aid. The testimony reads:

Q. Do you remember that person's problem?

A. Yeah, they had too much to drink. They were sick. They had fallen, and hit themselves, and we were, I had to apply first aid and wait for the EMTs who were on the property to come there.

Q. To address that person?

A. Yes. That person. Not Ms. Houston.
. . . .
Q. This person that you addressed, was she female or he male?

A. It was a female.

Q. Did this female have to leave the premises to address her medical need?

A. No. She refused medical treatment at an emergency. She took what the EMTs did on site.

(*Id.* p. 53:9-24).[8]

At Mr. Guynn's December 18, 2013 deposition, he gave diametrically different testimony. When asked about a Hyatt document stating that security had "escorted a lot of guests who were intoxicated to their rooms" (Dkt. 185-6), Mr. Guynn insisted that the only intoxicated person he had dealt with was "your client, period, dot." (Dkt. 207-2, p. 140: 14-16). When told that he had previously testified about a guest neighboring Ms. Houston who had had too much to drink, Mr. Guynn claimed that the situation had nothing to do with an intoxicated person but involved a woman who wanted her boyfriend to be kept from her room. (*Id.* p. 141:12-20). He brushed aside any contrary, prior testimony by stating that he did not understand the question back in March, and CG's lawyer joined that if Mr. Guynn had testified differently before, then "he didn't understand what you were asking." (*Id.* p. 141: 20-25). The excuse that prior, inconsistent testimony was the questioner's fault is indefensible; the transcript does not permit that explanation. Mr. Guynn's testimony in March was false or his testimony in December was false, but both cannot be true.

2. **Revenue from the Hyatt**

At his March 27, 2013 deposition, Mr. Guynn's testimony regarding the amount of his company's business that derives from its work for the Hyatt was

---

[8] According to the Hyatt, this scenario described by Mr. Guynn should have resulted in CG's preparation of an incident report. (Brian Combs Deposition Trans., Dkt. 169-19, at p. 169:8 to 171:12). Apparently, CG did not prepare an incident report, which may be one reason Mr. Guynn changed his testimony about this incident in his December testimony.

evasive and, in the light of later discovery, likely knowingly false.  Mr. Guynn testified that he did not know how much of his company's revenue in 2010 and 2011 was from work for Hyatt except that it was more than 50%; he did not know whether it was more than 60% or 70% or 80%; and he refused to say whether CG had any clients other than Hyatt in these years.  (March Dep. p. 93:16 to 94:23).  Though the court does not know why Mr. Guynn did not want to reveal his company's financial reliance on Hyatt, he was required to truthfully answer the questions and not evade them or feign ignorance.  When CG produced its tax returns, Ms. Houston learned that the Hyatt accounted for 100% of CG's business in the years 2009, 2010, and 2011 (*See* Dkt. 186-1), a state of affairs that Mr. Guynn undoubtedly knew.

C.   **CG's counsel impeding and frustrating the fair examination by Ms. Houston of a Hyatt deponent**

Ms. Houston's sanctions motions also raise an issue regarding CG's counsel's interference with her questioning of a Hyatt deponent, Brian Comes, on June 28, 2013.  The parties had agreed that Ms. Houston had no more than 90 minutes for her questioning of Mr. Comes.  The transcript from this deposition (Dkt. 169-19) shows that CG's counsel (Mr. Beyers) continually interrupted Ms. Houston's questioning without justification.  He objected to questions as outside the topics in the Rule 30(b)(6) notice, yet the deponent was not Mr. Beyers's client.  Further, Mr. Beyers had not brought the notice with him to the deposition, but nevertheless frequently asked Ms. Houston to tell him how her question related to a topic within the notice.  Mr. Beyers also interrupted Ms. Houston's lines of questioning to ask

her how much of her 90 minutes she had left.  (*Id.* p. 195:13 to 196:14).  His behavior was unprofessional and the record on its face suggests a purpose to frustrate Ms. Houston's examination of Mr. Comes.

## III.  Appropriate Sanctions

As the court has detailed in this entry, there is convincing evidence that CG engaged in a pattern of obstreperous discovery behavior from the outset of its appearance in this case that continued to the very last discovery it provided in December 2013.  Mr. Guynn showed himself to be an unreliable, evasive witness who provided false and misleading information.  The truthfulness of Ms. Mosley's testimony on certain matters—including her creation of documents and searches for them—is also in substantial doubt.  And CG's overall discovery regarding its guards and their work detail was steeped in misinformation and misdirection.  That, among other things, multiplied the resources Ms. Houston had to expend to obtain accurate information to which she was entitled.[9]

The court's inherent power and Rule 37 supply it with broad authority to sanction parties who abuse the discovery process.  A court's inherent power permits it to protect the integrity of the judicial system.  *Chambers v. NASCO, Inc.,* 501 U.S.

---

[9]     Ms. Houston's sanctions motions discuss other matters she believes show improper discovery behavior.  Although the court agrees that CG's inability to locate documents, such as Ms. Mosley's notes and security observation logs, is odd (particularly when CG had been told by Hyatt to save the observation logs and Ms. Mosley never throws away her notes), the court does not believe there is sufficient indication that the documents intentionally were destroyed.  Moreover, the court finds that sanctions are warranted without determining fault in connection with those documents.  In addition, as to the video surveillance, there is no indication that CG participated in its unavailability.

32, 44-45 (1991). Under Rule 37, the court has the power to sanction a party's making of evasive or incomplete disclosures in response to documents requests or interrogatories, or in answering deposition questions. *See* Rule 37(a)(4) (treating that behavior as a failure to "disclose, answer, or respond," which can be sanctioned under Rule 37(b)). Rule 30(d)(2) separately permits the court to impose sanctions on any person who "impedes, delays, or frustrates the fair examination of [a] deponent."

Sanctions serve two purposes: to penalize parties who do not follow the rules and to deter others tempted that abusive conduct has no consequences. *Greviskes v Universities Research Ass'n, Inc.,* 417 F.3d 752, 758-59 (7th Cir. 2005); *Philips Medical Sys. Int'l, B.V. v. Bruetman,* 982 F.2d 211, 214 (7th Cir. 1992). Rule 37 sanctions are appropriate where a party displays willfulness, bad faith, or fault in violating his discovery obligations. *Marrocco v. General Motors Corp.,* 966 F.2d 220, 224 (7th Cir. 1992). Willfulness or bad faith may be inferred through a party's "pattern of contumacious conduct or dilatory tactics," *Crown Life Ins. Co. v. Craig,* 995 F.2d 1376, 1383 (7th Cir. 1993), and fault considers whether a party's discovery conduct demonstrates objectively a lack of reasonableness. *Marrocco,* 966 F.2d at 224.

Whether exercising its inherent power or invoking Rule 37, the guiding principle is that a sanction must be proportional to the abusive conduct. *Allen v. Chicago Transit Auth.,* 317 F.3d 696, 703 (7th Cir. 2003) (sanction under court's inherent power "should be proportioned to the gravity of the offense"); *Maynard v.*

*Nygren,* 372 F.3d 890, 893 (7th Cir. 2004) (for Rule 37 sanctions, the punishment should fit the crime). The court should consider "the egregiousness of the conduct in question in relation to all aspects of the judicial process." *Dotson v. Bravo,* 321 F.3d 663, 667-68 (7th Cir. 2003) (internal quotation omitted).

Ms. Houston asks the court to default CG on liability, or to adopt adverse inferences against it, or to strike CG's summary judgment motion. The magistrate judge concludes that these forms of sanction are disproportionate in light of the fact that the court has already determined as a matter of law that Ms. Houston cannot establish the essential elements of her claim, a determination unrelated to the subjects of CG's discovery misconduct. In granting Hyatt's motion for summary judgment, the court assumed that Ms. Houston could prove that Hyatt and CG failed "to adequately police the premises, to control the crowd in the lobby, to monitor the amount of alcoholic beverages consumed, to hire more security guards for the evening, and to maintain elevator access on the second and third floors." (Dkt. 213 at pp. 5-6). Still, the court found, Ms. Houston could not show that these breaches of security were the proximate cause of her injuries and, on that basis, determined that judgment must be entered against her. The court accepted Ms. Houston's theory that there should have been better crowd spacing and control at the time Ms. Houston alighted from the escalators on the first floor on her way to the elevators but still found that nothing connected the crowd to her injury. By her own admission, Ms. Houston had two to three feet of space around her when she

was knocked on her left shoulder by an unknown person who caused her to fall.  (*Id.* at 10-11).[10]

CG's discovery misconduct should not, however, go unpunished.  It warrants a substantial monetary sanction.  A just and proportionate punishment is one related to Ms. Houston's efforts, from the time of CG's appearance in this case, to obtain discovery and to seek out information to support her theories.  CG should pay for *all* of Ms. Houston's efforts to gather information and evidence to support her case theories, whether or not related to the number of guards, their qualifications, or their work detail.  CG's misconduct permeated and infected the discovery process. CG materially interfered with Ms. Houston's basic rights to obtain timely and truthful information.  By requiring CG to pay for all of the efforts by Ms. Houston throughout discovery, the sanction captures the nature and essence of the misconduct by CG, reflects a strong condemnation of the misconduct by the court, and provides some meaningful relief to Ms. Houston.

This magistrate judge recommends that sanctions be entered against CG and in favor of Ms. Houston for all attorney time (calculated at a reasonable hourly rate and without regard to any fee agreement between Ms. Houston and her counsel) and expenses attributable to her counsel's work related to discovery, including (a) work in connection with preparing and reviewing written discovery requests and responses to written discovery by Hyatt, CG, and any non-parties; (b) work in connection with depositions, including preparing for and taking depositions; (c)

---

[10]     An adverse inference, one of the sanctions Ms. Houston seeks, would have no impact in light of these findings.

work in connection with preparing and responding to discovery motions; (d) expenses associated with her retention of an expert; and (e) work in connection with her motions for sanctions. The court anticipates that these fees and expenses may be substantial, and finds that a sanction of that magnitude is just and proportional in light of CG's serious misconduct.

## <u>Conclusion</u>

The magistrate judge recommends that the court GRANT Ms. Houston's motions for sanctions (Dkts. 169, 197, and 206) by imposing sanctions against CG and in favor of Ms. Houston as described above. The magistrate judge further recommends that Ms. Houston's counsel be directed to file a petition for fees with corresponding support.

So ORDERED.

Date: _03/12/2014_

_Debra McVicker Lynch_
Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

**Distribution:**

**All ECF-registered counsel of record via email generated by the court's ECF system**